Good morning, Your Honors. I'd like to reserve one minute of my time for rebuttal. My name is Christopher Dellert. I'm representing Cary Anderson, the plaintiff appellant, in this case. I'd like to simplify my argument or my presentation here to focus on Dr. Alpern's opinion that Mr. Anderson would be limited to two hours of standing and walking and an eight-hour workday. This limitation is pivotal in this case as it would lead to a conclusion that Mr. Anderson was limited to no more than sedentary work under the regulations. This is key because the only job that the administrative law judge found that Mr. Anderson could perform was the job of journalist, which is performed at the light level. So a limitation to sedentary work would likely eliminate this job. If the sequential evaluation process proceeded to Step 5, the medical vocational guidelines would apply and Mr. Anderson would be found disabled based on his age, the limitation to sedentary work, and possibly a lack of transferable skills. The reason we can't ask for payment of benefits in this case, though, is that these issues weren't developed at the hearing. The ALJ did not pose this hypothetical question with that limitation to the vocational consultants. We don't know for sure that the journalist... What hypothetical question? I'm sorry. There was no question about the limitation to two hours of standing and walking on the impact on the ability to perform the job of a journalist. It strikes me that the record here, what's most concerning to me is that there was very little consideration of his, what I thought he was most stressing, which is his actual psoriasis and the fact that it was bleeding and that it was painful and that he really couldn't go out without having, in any presentable way, and that it hurt terribly. Just the actual psoriasis. And you don't, I mean, in terms of him standing, it appears that he could walk okay except that he was in pain. Well, the pain is, the pain and the fatigue are the primary, seem to be the primary driving forces. The pain largely due to his skin condition. To the skin condition, to the psoriatic arthritis, and to his degenerative disc disease, the combination. And these are issues that weren't really developed because the administrative law judge didn't ask Dr. Alperin to clarify how he had come to those, to that conclusion. Seemingly, he based it on Nurse Bushnell's suggestion that Mr. Anderson not engage in prolonged standing. So if we take that, if we use that as the basis, then Dr. Alperin has translated this recommendation into a vocationally relevant limitation. I'd like to follow on from what Judge Berzon was asking. We can talk about standing for two hours. We can talk about those things. But what's disabling in Mr. Anderson's mind, and he made it crystal clear, and then he was just terribly frustrated, he said, can I bring you in all the bloody clothes? I mean, this man has uncontrolled bleeding or unpredictable bleeding for extended periods. He has trouble taking a shower because of the bleeding. I mean, in his own mind, if I'm going to be a journalist and I've got to go out and worry about bleeding all over the place because of my skin condition, that in itself is going to make my job very difficult or impossible. And yet somehow we keep talking about how long he can stand. The reason that I chose to focus on focusing on that is because the information about the bleeding, we don't know exactly how that would impact his vocational or his ability to perform the kind of work. It was never dealt with. What was that? I mean, the ALJ never mentioned it, refused to hear it, and so on. Yes, ma'am. I mentioned that in my final argument where the duty to develop. Just even reading the transcript, we can sense Mr. Anderson's frustration at the process, but he was never able to put any of these concerns into something that would be, that we could review for transferability into a vocational setting. He's saying that he takes a long time, but if you know it takes you two hours to shower in the morning, how do you adjust your schedule so you can still make it to work? Because we don't have enough evidence here, or the record is not developed sufficiently to find him disabled on the record, I focused on the legal errors that would mandate a remand, and on remand, with representation for the development of the record, we could cure these kind of errors. So that was why I'm focusing on the more nuanced issue of the two hours. One of your arguments is also that the record wasn't adequately developed. Yes, ma'am. And he was pro se before? He did not get representation until, he actually had to get several extensions of time just to find a representative before the district court. I'm not sure exactly what process he took. I know he talked to legal aid in Alaska Bar. At some point, several months after his statute for appeal had run out, he contacted our office and we agreed to take his case forward. So that was the first time that he had any professional help in his case. Okay. To circle back to Dr. Alperin's opinion, Dr. Alperin is the only source who reviewed the entire record and offered, aside from the state agency reviewers back in 2014, 2015, or prior to the hearing in any event, he was the only source who reviewed the entire record. He offered his testimony at the hearing. The administrative law judge had the opportunity to ask the relevant questions about his conclusions. In rejecting this opinion, the administrative law judge offered three factors. First, appearance with normal strength and gait at various appointments. There's a vast difference between demonstrating normal strength and normal gait in a clinical setting once every few months for a few moments, and the ability to sustain activity over an eight-hour workday. So these findings were not substantial evidence supporting the rejection of this opinion. The other two factors involved Mr. Anderson's reports that he was able to drive and able to shop. Driving has no bearing on the ability to stand or walk. It's a sedentary activity, wholly consistent with Dr. Alperin's opinion. Shopping, as Mr. Anderson described in his functional report, he did for ten minutes to a little bit over an hour. So even if he did that five days a week, as consistent with work activity, it still would not be inconsistent with the limitation to two hours of standing and walking. So the reasons that the administrative law judge gave for rejecting this particular limitation did not satisfy the legal standard for reviewing the medical evidence. And then Dr. Anderson's opinion is likely a conservative measure of Mr. Anderson's opinion because the record itself is predominantly objective findings which only measure part of the impact of an individual's impairments. They don't factor in... The doctor that testified on the telephone that had never met him and so on, right? Correct, ma'am. Okay, and he was rather short. I mean, you're relying on him, but he didn't know very much. I'm forced to rely on him because that's the only functional assessment we have in the record. Typically... This may go to the question of development of the record. So the doctor doesn't see him, the doctor talks to him on the telephone, the doctor does not have color photographs, I mean... And the doctor thinks he's a woman. Initially, yes. And that was another element that I think started Mr. Anderson's downhill spiral during the hearing. But if we take it... As administrative law judges typically will rely on the state agency reviewers who not only never meet the individual, they're never cross-examined, and they typically see the file within the first six or eight months after the claim is filed, and there's always subsequent development. So... Why don't we hear from the government? You've got a little bit of time, but rather than use it all up now, why don't we hear from the government and then you'll have a chance to respond. Thank you, Your Honor. May it please the court, counsel, Lars Nelson on behalf of the commissioner. Your Honors, I would guess I'd jump right into the issue of disabling psoriasis and whether the ALJ properly considered that. I would begin by pointing out to the second to the last paragraph on page 22 of the ALJ's decision where he discusses the allegations of open sores, of psoriasis, problems with bleeding. So that is the ALJ summarizing... What page are you on now, sir? Second to the last paragraph on page 22, and that's as the commissioner has numbered it. It's page 66. Well, he says the claimant said this, but he later partially regarded him as not credible, right? Yes, Your Honor. So if you go to page 24, well, between that period, the ALJ provides a chronological discussion of the medical record, and then at the last paragraph of page 24, page 68, as renumbered... He says, for example, Dr. Armstrong noticed stability on embryo, later noted by Ms. Bushnell. The record, the claimant said that he actually couldn't take the embryo because it was making him terribly sick and affected his immune system. And so there really wasn't stability in embryo because by the time of the hearing, he couldn't take it, right? He actually makes conflicting statements. I'd like to focus the Court's attention to the very next sentence, though, because I think that's key to wrapping up the issue of the psoriasis. It says, overall, there's no evidence of suspicious lesions in the record. What does suspicious lesions mean? Suspicious lesions says he doesn't have cancer, but it has nothing to do with his complaint. It has nothing to do with his complaint. He's not saying he has cancer. He's saying he has psoriasis. If you look at the listings pertaining to psoriasis that's mentioned in the Commissioner's briefing, the listings specifically direct the ALJ to consider the issue of lesions because lesions equates with bleeding, with open wounds. Suspicious bleeding means something different in context here. He doesn't say he doesn't have lesions. He says he doesn't have suspicious lesions. He obviously doesn't have lesions. Why was he bleeding, or what is a psoriasis other than lesions? But they weren't suspicious, meaning they weren't potentially cancerous. Well, Your Honor, there's only one record from Dr. Armstrong that notes lesions suspicious or otherwise, and that's in almost a four-year span of records for the relevant period. So, I mean, the ALJ has the record before him, which consisted of all of the treatment notes from the nurse practitioner, which was the primary treatment provider, as well as the dermatologists, Drs. Armstrong and Kennebrew. You referred to something from Dr. Armstrong. Do you have a citation for that? For only the one observation? Yes, the citation would be 435 to 36. And notably, in that very same record, Dr. Armstrong recommends that he continue embryo because the claimant reports he has 75% improvement and he is halibut fishing. And when was that? This was in August of 2012. Okay. What period are we looking at in general? When was the hearing? The hearing, I believe, was in November of 2015. Right. So, therefore, it's not very good evidence of him actually having control with embryo, right? Three years after. Yes. Now, in, you know, September of 2012 at 460, he says no side effects from embryo. Again, in July of 2013 at 449, no side effects. He discontinues in May 2014. In September 2014 at 437, he says there were side effects. And then in May 2014, he says embryo and Humira gave him side effects and they were expensive, but he would consider it again if his condition worsened. And that is at 548. And at the hearing, he testified that he had embryo in his refrigerator. Now, he basically... What he does say with regard to the lesions, I think this is the same report, Dr. Armstrong, diffuse, I don't know what, erythema and scaling of the right leg was numular scaling lesions over the torso. He's not saying he doesn't have lesions. He's saying he does have lesions. Yes, and that's the only record where lesions are noted. Is that what psoriasis is? No, it's scaling of the skin. It's cumulative skin growth where the skin is... But if you're bleeding, that suggests lesions, correct? Yes, yes. Unless you're just going to say Mr. Anderson's a total liar, he says he bleeds a lot. For that, it's not that he's a total liar. It's just that the ALJ was reviewing the record before her. The ALJ did not confront this question, did he? Did he say he was lying when he said he was bleeding? No, he just ignored it, right? No, and on page 24, the ALJ acknowledges the psoriasis. I know, but in his conclusion, or when he gave the vocational expert the hypothetical, he didn't include the bleeding. Well, I mean, I guess merely bleeding would not be a vocational. It would have to translate in some vocational manner. I'm not sure how it would. Walking around, as he described it, which is bleeding so much that it went through your clothes routinely, that wouldn't be a problem? That was his allegation that was never borne out. Yes, but it wasn't dealt with. That's what I'm trying to say. The ALJ didn't say it did happen or it didn't happen or it doesn't matter. It says nothing about it. Well, Your Honor, when you say there's nothing about it, as Your Honor ruled in Reed, one way to develop the record is with consultative examinations. And the ALJ sent the claimant out for three consultative examinations in this matter, including with Dr. Meinhart. My point is that the ALJ, in his opinion, just doesn't deal with this. The claimant, I mean, his most vivid testimony and in his written reports is about that. He reports it in this one paragraph that he said it, but then he just, and he walks in and says, I want to show you these rags, I want to show you my clothes, how bloody they are. And, I mean, for good reason, I guess he doesn't want to see the blood, but he doesn't deal with it. He doesn't say anywhere it's true or it isn't true or it doesn't matter because it wouldn't be disabling. He just says nothing about it. Well, Your Honor, I would disagree with that. When the ALJ. I would disagree with that. He didn't say anything about it. And I would disagree where the ALJ considers open sores and bleeding and summarizing the subjective complaints. Right. And then discusses the question of lesions all the way through and then turns to the claimant's psoriasis is extensive. So it's acknowledged by the ALJ. That's on 24. It is extensive. But there's stability with emerald. And then there's no suspicious lesions. And then he turns also to the question of pain. And the claimant's pain was fully addressed by Percocet in this case to the point where the claimant would say, I take two Percocets in the morning and I work. And then I take one to two in the afternoon and I continue working. Is it accurate to say that when the vocational expert was given, okay, with these characteristics, can this person work? Is it accurate to say that the bleeding was not part of that description? Well, the ALJ only has to include credible limitations in the. Credible limitations. I'm trying to figure out if the ALJ has a reason for saying I don't believe him. He talks about the claimant stated he had terrible itching and pain as well as bleeding. Then the next two pages later, overall there's no evidence of suspicious lesions in the record. Well, no evidence. That's weird because there's clear evidence of bleeding. Now, he can say I don't believe the evidence. But he says there's no evidence. And he doesn't say lesions. He said no evidence of suspicious lesions. So I'm not sure what the ALJ is doing with all this stuff about bleeding. I mean, he's certainly not giving it to the vocational expert. Well, Your Honor, I would direct the court to just two points. He was sent for a consultative examination with Dr. Meinhardt who looked at the pictures that the claimant brought in and who noted that he had plaque psoriasis but noted no lesions. The ALJ has to. No lesions or no suspicious lesions? I believe that Dr. Meinhardt said no lesions. Where are we in Dr. Meinhardt? I've got that in front of me. I believe that would be at 540 is the actual examination. So he looks at the pictures. Let's not be vague. Give me the precise line. I'm on page 540. Unfortunately, I don't have Dr. Meinhardt's opinion right in front of me. Because if you're going to tell me there's something there, I want to see it. So where is it on that page? This is mid-page H-E-E-N-T. The patient has plaque psoriasis about the face and forehead. I could not actually visualize the amount of scalene and cerumen on the ears. And there is no notation of lesions. The patient has multiple photographs. This is going down. Photographs of severe plaque psoriasis, much of which is bleeding post-shower. Yep, this is generalized plaque psoriasis from head to toe. And bleeding. Yes, but, Your Honor, those are photographs that if he was bleeding at this consultative examination, Dr. Meinhardt would have noted it. His testimony isn't that I bleed all the time. His testimony doesn't require to be consistent that he's bleeding in the doctor's office. No, Your Honor. Under 20 CFR 404, 1527C4, the ALJ has to consider the subjective complaints in light of the record as a whole. That's not subjective. It's a fact. It's either true or isn't true, and the ALJ didn't decide whether it's true or isn't true. And it's not subjective. When it's not made as an objective finding by a medical source, it becomes just a subject. I'm just reading Dr. Meinhardt. He says bleeding. He observes bleeding on the pictures. When he does the physical exam, he just notices the plaque psoriasis, which is just the accumulation of cells. I see that I've used up my time, so unless the Court has any further questions. I'll escape that way. Hang on. Don't go away. These photos show a severe plaque psoriasis, much of which is bleeding post-shower. So in the photographs, he sees evidence of bleeding, correct? Yes, Your Honor. Okay. And somehow the ALJ, she just manages to gloss right over it in any talk to the vocational expert. And ALJ says there's no evidence of suspicious lesions. Suspicious lesions is different from lesions. ALJ notes that he testifies that there's bleeding, but then doesn't deal with it. And for that, Your Honor, I would point to Dr. Alvord, who said he relied on Dr. Meinhardt's opinion in rendering his. Dr. Meinhardt does not incorporate any special limitations related to bleeding. And Dr. Alvord and Dr. Smith's opinion overlap on all but the issue of two hours of standing, and I would refer the court to the briefing on why that limitation was properly discounted. Thank you, Your Honor. All right, Your Honors. First, counsel focused specifically on psoriasis, but it is a combination of impairments that renders Mr. Anderson disabled. He has back impairments that cause pain. He has psoriasis. He has psoriatic arthritis. So whether or not the psoriasis itself was disabling, when you factor the frustration that that causes all the bleeding and such in with the other impairments, that's what renders Mr. Anderson unable to sustain work activity. The administrative law judge didn't actually use any of the findings that she summarized to discount any specific allegations by Mr. Anderson. Rather, she summarized them, said, for this reason I find he's not credible, and then moved on to a few other reasons. A mere summary is not enough to count as a discounting of allegations. It has to be specific testimony undermined by specific evidence, according to Brown-Hunter. And finally, the consultative examination by Dr. Meinhardt did not offer any kind of functional assessment, let alone address the bleeding. Thank you, Your Honors. Thank you. Thank you very much. Anderson v. Bearhill, submitted. Nice to see you again, Mr. Nelson. I saw you in Seattle last month.
judges: Tashima, W. Fletcher, Berzon